IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 15, 2002 Session

## STATE OF TENNESSEE v. JAMES ARTHUR KIMBRELL

**Direct Appeal from the Circuit Court for Fentress County**
**No. 7633      E. Shayne Sexton, Judge**

_____

**No. M2000-02925-CCA-R3-CD - Filed April 15, 2003**

_____

On September 3, 1999, a Fentress County jury convicted the Defendant of four counts of rape of a child, a Class A felony; five counts of rape, a Class B felony; and thirteen counts of incest, a Class C felony. The trial court imposed an effective sentence of forty years. The Defendant now appeals arguing that ineffective assistance of counsel at trial, along with newly discovered evidence, prejudiced the Defendant to the point of depriving him of a fair trial with a reliable result. After a review of the record, we conclude that the Defendant was denied due process through ineffective assistance of counsel. We therefore reverse the Defendant's convictions and remand this case to the Fentress County Circuit Court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

David L. Raybin, Nashville, Tennessee, for the appellant, James Arthur Kimbrell.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William Paul Phillips, District Attorney General; and John W. Galloway, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. PROCEDURAL HISTORY**

On May 15, 1998, the Fentress County Grand Jury indicted the Defendant, James Kimbrell, on five counts of rape of a child, five counts of rape, twenty counts of incest, one count of felonious reckless endangerment and one count of reckless driving. In January 1999, the reckless endangerment and reckless driving counts were severed from the sexual offenses. The Defendant pled not guilty to the sexual offenses, and a jury trial was conducted on September 2, 1999. On

September 3, 1999, the Defendant was convicted of four counts of rape of a child, a Class A felony; five counts of rape, a Class B felony; and thirteen counts of incest, a Class C felony.

On November 9, 1999, following a sentencing hearing, the trial court sentenced the Defendant to concurrent twenty-year at 30% sentences for each rape of a child conviction. The trial court sentenced the Defendant to ten years for each rape conviction. It ordered that the sentences for three of the rape convictions run concurrently and that the sentences for the remaining two rape convictions run concurrently to each other but consecutively to the other three sentences. Each of the five sentences for rape was to be served at 100%. The court further ordered that the sentences for the five rape convictions run consecutively to the sentences for rape of a child. Additionally, the court imposed a sentence of three years at 30% for each of the thirteen counts of incest, to run concurrently with each other and with all the other sentences. The resulting effective sentence was thus twenty years at 30% followed by twenty years at 100%, to be served in the Tennessee Department of Correction. This appeal ensued.

The Defendant presents six issues for our review: (1) whether trial counsel rendered ineffective assistance of counsel; (2) whether the Defendant is entitled to a new trial based on newly discovered evidence; (3) whether the trial court allowed into evidence improper proof of additional sexual offenses; (4) whether the charged offenses should have been severed; (5) whether the trial court erred in failing to charge the jury on election and how to consider the "uncharged acts" and; (6) whether the Assistant District Attorney improperly argued facts which were not in evidence.

## II.  FACTS

### A.  Evidence Presented at Trial

The victim, M.K.,[1] was eighteen years old and married at the time of the trial. M.K. stated that the Defendant was her adopted father and that he was married to Frances N. Kimbrell, her adopted mother, during the time the alleged events took place. M.K. testified that when she was five years old, she and her biological sister, Bethany, who is three years younger than her, were placed together in foster care with the Kimbrells, who later adopted them. M.K. testified that the Kimbrells also had a natural daughter, Julie, and an adopted son, Christopher, who lived in the home. M.K. recalled that at times, other foster children lived with the Kimbrells. M.K. testified that around 1990 the Kimbrells moved into a home in Clarkrange, located in Fentress County, where they lived until 1997.

M.K. testified that the Defendant initially fondled her and touched her in places "where he should not be touching [her]." She recalled that the Defendant touched her breasts, her buttocks, and her vaginal area. She testified that he first penetrated her when she was ten years old and that the

---

[1]  It is the policy of this Court not to identify minor children involved in sexual abuse cases by name, even though the victim was no longer a minor at the time of trial. Instead, we will identify the minor victim in this case by her initials.

sexual abuse continued until she was seventeen years old. At that time, M.K. reported the abuse and left home. She stated that the abuse usually occurred in the Kimbrell home while Mrs. Kimbrell was away. However, M.K. testified that when Mrs. Kimbrell was home, the abuse occurred in the loft of the barn. She further stated that when Mrs. Kimbrell was away, the Defendant would supervise the younger children. On those occasions, he would often give Bethany and Christopher money to buy bread or candy and tell them to go to the store, which was about a half of a mile from the home.

M.K. testified that all the sexual incidents consisted of "normal sexual intercourse." She stated that more than fifty incidents of sexual abuse occurred over the seven-year period. She testified that because of the frequency of the abuse, she had difficulty recalling specific incidents, but stated that she could clearly remember the places where the abuse occurred. She stated that from 1990 until her thirteenth birthday on September 22, 1993, she had intercourse with the Defendant more than five times: once in the loft of the barn, on her bedroom floor more than once, and once on the couch in the living room. She could not recall, however, whether any abuse occurred in the Defendant's bedroom during that time period. M.K. testified that sexual intercourse with the Defendant "started becoming a regular thing" when she was "about twelve . . . years old up until [she] was sixteen."

M.K. stated that from the time she turned thirteen until she turned fifteen, she and the Defendant had intercourse more than five times. She testified that during this period of time the incidents were most frequent. She recalled an occasion when the Defendant took her, her sister, and Christopher on a fishing trip to the City Lake in Fentress County. She testified that it began to rain, so her sister and Christopher sought shelter nearby, while she walked to the Defendant's truck. M.K. testified that the Defendant followed her to the truck, and they had intercourse in the truck. She recalled another occasion when she, the Defendant, her sister, and Christopher worked in the yard, and while the others were outside burning a pile of brush, she and the Defendant had intercourse in her bedroom. She testified that she had intercourse with the Defendant in her bedroom at times other than on the day of the brush-pile burning.

M.K. testified that between her thirteenth and fifteenth birthdays, she had sexual intercourse with the Defendant in the living room. She stated that the abuse also occurred in the loft of the barn during this period of time.

M.K. testified that between the time she turned fifteen and the time when she left home, she and the Defendant had intercourse in the loft of the barn after they had gathered walnuts. M.K. stated that on her sixteenth birthday, she "begged" the Defendant not to have intercourse with her any more, but things did not change. She testified that the Defendant became angry, and she could not recall if they had intercourse that evening. M.K. estimated that from her sixteenth birthday until she left home at age seventeen, she and the Defendant had sex approximately eight times. She stated that the abuse became less frequent after she "realized [that she could] push him off." M.K. acknowledged that she did not always push the Defendant away because she relied on him to prevent her mother from yelling at her or beating her. M.K. stated that it was obvious to everyone in the family that she was his favorite child, and this is what caused her mother to dislike her. She also

stated that she helped the Defendant with his paperwork, wrote the checks to pay the family bills, did the laundry for herself and her sister, and did most of the cooking. M.K. testified that the Defendant and his wife never got along very well.

M.K. testified that in August 1997, the Defendant bought a house and some property on Rock Quarry Road in Clarkrange. She stated that on more than one occasion, she and the Defendant went to work on the property before the family moved in. M.K. recalled on one occasion, she and the Defendant had sexual intercourse inside the home on a piece of carpet. She testified that on two separate occasions she and the Defendant had sexual intercourse in a cave on the property and on the trail to the cave. M.K. testified that she "stayed sad a lot of the times because [she] didn't like it, and [she] cried a lot because of it, to him."

M.K. testified that the Defendant sometimes used a condom, depending on "whether [they] were where he had put some up . . . ." She stated that he kept a plastic container with some condoms in it near her bedroom, and he also kept some above the windows in the loft of the barn. M.K. testified that she never saw what he did with the condoms after they were used because she would leave as soon as they were finished having sex. She testified that she once thought she might be pregnant and told the Defendant. According to M.K., the Defendant "said something about eating celery or something and it would wash all the fluids out of [her] or something like that."

M.K. testified that on November 8, 1997, after the family had moved into the new house, she received a phone call from a boy she knew from church. She stated that the two talked frequently, but on this occasion, the Defendant came home while she was on the phone, became angry and grabbed the phone from her. M.K. recalled that after the Defendant hung up the phone, he and his wife began arguing. Mrs. Kimbrell then left the home. According to M.K., Mrs. Kimbrell stated, "Beth and Chris get your stuff and let's go." M.K. understood that to mean that Mrs. Kimbrell did not want her to go with them. M.K. testified that she left the home two days later on Monday, November 10, 1997.

M.K. testified that she finally decided to tell someone about the abuse when the Defendant tried to fondle her early one morning as she was sleeping on the couch. She claimed that the Defendant would not stop when she asked him to do so. M.K. stated that at that time, she was working at Little Pumpkin Child Care. When she arrived at work, she told her boss, Cynthia Sherrill, about the abuse. That night, she went to the home of Ron and Nancy Kington, her new foster parents, and never returned to the Defendant's home.

M.K. testified that the Department of Human Services (DHS) conducted an investigation. She was interviewed by Shane Lyttle. She stated that, over the years, she had spoken with other DHS workers, including DeWayne Wakefield and George Stephens, regarding beatings by Mrs. Kimbrell, but she never reported the sexual incidents. M.K. maintained that she did not report the sexual abuse because she felt that she would not be believed. According to M.K., because DHS did not respond to her allegations concerning physical abuse by Mrs. Kimbrell, which, according to M.K., were substantiated by bruises, she believed that nothing would be done about the sexual abuse.

-4-

Finally, M.K. testified that she was examined by a nurse practitioner and that, prior to that examination, she had never had sexual intercourse with anyone other than the Defendant.

On cross-examination, M.K. testified that there was no television in the Kimbrell home and that they were allowed to listen to a radio only if the radio was tuned to a Christian station. She stated that she was not allowed to wear pants or jewelry, although she admitted that she did wear make-up. M.K. testified that she was not allowed to date before the age of eighteen. M.K. testified she was required to attend church twice a week and had to sit with her parents during church. She reported that when the Kimbrell children went to the County Fair, they were allowed to attend only gospel shows. M.K. also admitted that, even though it was against the rules, she did sometimes change into shorts once she arrived at school, but that she did so "not very often."

M.K. recalled that Julie Kimbrell was still living in the home when the sexual abuse began. She stated that she told Julie that the Defendant was "touching her." M.K. testified that Julie questioned the Defendant about the abuse, but the Defendant "did come back to [M.K.] with it." M.K. stated that from 1990, when the abuse began, until 1993, when Julie married and moved out of the home, the sexual abuse always occurred when Julie was not at home.

M.K. testified that in addition to her interview with DHS worker, Shane Lyttle, she was interviewed by Ann Austin from the Department of Children's Services (DCS). She admitted that during these interviews, she never mentioned anything about sexual activity with the Defendant at City Lake, the cave at the new home, or the trail leading up to that cave because she felt DCS did not need to know the details. However, M.K. insisted she told her lawyer everything.

M.K. stated that the DHS investigators never asked her if she was being sexually abused, and she acknowledged that she was not sure if she would have admitted the abuse had she been asked. M.K. testified that she spoke with her biological aunt, Faye Human, many times by phone and that she had written notes to her aunt for about a month while living with the Kimbrells. M.K. stated that she repeatedly asked her aunt if she could live with her, but she admitted that she never mentioned to her aunt that she was being sexually abused. M.K. testified that she did not think that her aunt could help her. M.K. testified that she was able to give her attorney more details concerning the sexual abuse because she had time to think about the incidents. She stated that she had nothing to gain by testifying at trial.

Bethany Kimbrell, who was sixteen years old at the time of trial, testified that she was about two years old when she went to live with the Kimbrells. She stated that she had often been in the loft of the barn in Clarkrange, where she found new and used condoms. Bethany stated that at first she did not know what they were. She recalled that she usually found two or three used condoms at a time "just laying around on the top loft on the floor." Bethany testified that the new condoms were located on a board above the doors in the loft. Bethany stated that she threw the used condoms over the fence and kept the new ones even though she said she did not know what they were. She testified that she never saw the Defendant in that part of the loft.

Bethany recalled that on occasions when she, M.K. and Christopher were home with the Defendant, the Defendant frequently sent her and Christopher to the store. She testified that a trip to the store took between thirty and forty-five minutes. Bethany stated that on other occasions, the Defendant would require her and Christopher to stay outside or in their rooms. She testified that she had no actual knowledge of what occurred when M.K. was alone with the Defendant.

On cross-examination, Bethany acknowledged that she could not remember the first time she found condoms in the loft. However, she stated that the last time she found them was when the family was cleaning out the barn to move. She admitted that she did not tell DHS workers about finding the condoms in the loft. She also testified that she did not mention the condoms to Shane Lyttle when he was taping an interview with her specifically about the allegations of sexual abuse made by M.K. Bethany testified that Christopher knew that she had found the condoms because he was with her when she found them. Bethany testified that she did tell her new foster parents or, in an untaped interview, a DHS worker named Beth Smith about the condoms in the loft. Finally, on re-direct examination, she testified that the first time she contacted the Department of Human Services regarding the allegation of physical abuse by her mother, she was punished for doing so by having to stay in her room, except for eating supper, for two or three weeks. However, she testified that M.K. was not punished because of that report or investigation.

Sue Ross, a pediatric nurse practitioner at Our Kids Center in Nashville, Tennessee, testified that she examined M.K. on January 7, 1998. According to Ross, Our Kids Center is a clinic of Metro-General Hospital that was established in 1987 to perform evaluations on children alleged to have been sexually abused. She reported that her examination of M.K. revealed an indication of past penetration trauma to the hymen. On cross-examination, Ross stated that she could not tell from the examination how often penetration had occurred or how long ago it had occurred.

The Defendant testified that he was fifty-three years old at the time of the trial and that his primary area of employment was in construction as a contractor and a carpenter. He recalled that he moved to Fentress County, Tennessee from Indiana in 1980. The Defendant testified that his marriage to Frances Kimbrell lasted thirty-three and one-half years. The couple had two natural children, Jimmy and Julie, and over a period of about eight years until 1994 or 1995, over forty foster children stayed in their home. The Defendant testified that in 1989 or 1990, he and his wife adopted M.K., Bethany, and Chris. He stated the family went to church "every time the door was open" and that they went to several types of "organizational" churches.

The Defendant admitted that the girls were not allowed to wear slacks, jewelry, or make-up. The Defendant testified that the girls were required to wear their dresses and skirts below the knee and to attend Christian school. The Defendant did not allow the girls to date until they became eighteen. He testified that the girls could not cut their hair except to trim split ends. There was no television in the home, and the radio was tuned only to gospel stations. The Defendant reported that his personal habits also excluded the use of alcohol, and he had not used any tobacco since the age of sixteen.

The Defendant testified that he was divorced from his wife at the time of the trial. He stated that they had a long history of problems prior to the divorce that stemmed from his wife's desire to live in a different manner. The Defendant testified that among other things, Mrs. Kimbrell wanted a television and credit cards. He stated that his wife had obtained credit cards, but did not tell him. The Defendant testified that his wife left before the allegations of sexual abuse, and he believed she had been planning to leave him for some time prior. The Defendant testified that he also had problems with M.K., beginning when she was about fourteen, about the rules of the house. He recalled that she wore make-up, wore shorts at school, and wanted to date. He testified that he agreed to permit her to invite boys to sit with the family at church, as he had allowed his natural daughter, Julie, to do at that age.

The Defendant denied having sex with his daughter, M.K. He testified that he had trouble performing sexually and that he sought treatment first from his regular doctor, and then from a specialist, Dr. Goryl. The Defendant reported that he saw Dr. Goryl about two times, and he thought the visits occurred during the summer of August, 1994. He stated that the doctor tried two types of treatments, one of which involved a procedure that the Defendant had to perform thirty minutes before sex. The other treatment was a shot, which the Defendant testified was not effective. According to the Defendant, he told the doctor that he did not want to go through the procedure before sex, and "if that is what had to happen, it wasn't that important, [he] wasn't that interested."

On cross-examination, the Defendant admitted that he had been reluctant to go to the doctor and finally went at the request of his wife because it was important to her. He testified that after 1994, he had sex with his wife only a "very few times" and acknowledged that he had been able to perform on occasion. When asked if he had any heart problems between 1993 and 1997, the Defendant testified that he had been in Cookeville Hospital in June of 1997. He further testified that he did not have diabetes and that he did not take any medication for high blood pressure, although he said his blood pressure always ran a little high. The Defendant stated that Dr. Goryl told him that his hormone level was "near zero."

The Defendant testified that the rules he enforced in his house were based on his religious beliefs. He stated that when he married Mrs. Kimbrell, she shared his beliefs, but as time passed, she began to want a television and credit cards. The Defendant testified that his wife threatened to leave before they adopted children.

The Defendant testified that on the night Mrs. Kimbrell moved out of the house, he was infuriated with M.K. because she was "throwing a fit." He stated that she was upset because her younger brother had gone with the Defendant to the "other property" to move some things, and she did not want her brother to go. The Defendant testified that just before the argument with Mrs. Kimbrell, M.K. was talking on the phone with a boy, and he took the phone from her and told the boy not to call back. He denied "cussing." He admitted that when his wife left, she said that he could move "her" into his bedroom since "she" was practically there anyway. The Defendant stated that the Assistant District Attorney General just assumed that "her" and "she" were M.K.

The Defendant testified that when he was first interviewed by Shane Lyttle, he stated that he was not aware of any opportunity that M.K. had to have sex with any boys unless it was while she was at school. However, when asked if "that would still be true today, [that] you are not aware of any other times she would have had sex with anybody?" the Defendant replied, "I have found out a lot of things since she left."

Finally, the Defendant testified that he did have some problems with M.K. because she wanted to talk to, date, or write letters to boys. He testified that there was an incident in 1995, which he later discussed with DHS workers, when he had found some "very vulgar letters" either to or from two different boys, one of whom was Will Campbell. He stated that he spoke to the parents of one of the boys and disciplined M.K. by making her eat a one-page letter she had written to Will Campbell.

Dr. Stephen V. Goryl, a specialist in urology, testified that he first saw the Defendant on April 14, 1994, on a referral from Dr. Gray Smith. Dr. Goryl stated that the Defendant complained of erectile dysfunction. According to Dr. Goryl, the Defendant stated that he had had the problem for ten years and that he had no desire for sex. The doctor stated that his records showed that the Defendant stated that he never woke up with an erection, despite the fact that he was not on any medication, was not diabetic, and had no significant past medical history to explain the problem. The doctor explained that at the time, the treatment options for the Defendant's problem were limited, but the Defendant tried the two drugs that were available at the time.

Dr. Goryl testified that he tested the Defendant's serum testosterone, because occasionally, men who have no desire for sex have low testosterone. However, the Defendant's test results were normal. When the Defendant returned for a second visit on May 12, 1994 and indicated that the medications had not helped, the doctor ordered a shot of testosterol for him. The doctor testified that the second visit was the last time he saw the Defendant. He stated that he did not recall what other treatments he offered the Defendant, but he testified that he probably told the Defendant that he could get injections that would create an erection.

On cross-examination, Dr. Goryl testified that either physical pain or psychological problems can prevent men from having erections. The doctor explained that in diagnosing erectile dysfunction, all possible physical problems must first be eliminated. Dr. Goryl reported that he found no physiological cause for the Defendant's impotence. Finally, Dr. Goryl testified that a person can be impotent with one sex partner and be fine with another.

Julie Townsley, the Kimbrells' natural daughter, testified that she was thirty-one at the time of the trial and that she was twenty-five years old when she left home in 1993 to get married. She stated that she had lived in the home with the three adopted children and several foster children. Townsley testified that while she was living with her parents, there was no television in the home, and she listened to news or gospel radio. She stated she did not wear pants, drink alcohol, or use tobacco. She testified that she was allowed to wear make-up and jewelry. She also testified that she was allowed to date boys once she turned seventeen. In addition, she said she always saw her father

fully clothed around the house. Townsley testified that she did not feel restricted by the rules. However, she believed that M.K. did have problems with the rules and tried to rebel against them.

Mrs. Townsley testified that M.K. had never discussed any improper behavior by the Defendant. On cross-examination, she stated that if M.K. had ever said "anything as serious as that," she would have sought out the truth. Julie Townsley acknowledged that there were times when she and her mother were working, and the Defendant was alone with the children.

Bob Allred testified that he had known the Defendant since 1992. He testified that they attended church together and that he had frequently visited the Defendant's home. He stated he had always found the Defendant to be a truthful man and that his reputation in the community was as a truthful person.

Ed Hatfield testified that he had been a resident of Fentress County since 1972 and that he had known the Defendant for thirty to thirty-five years, dating back to when the Defendant lived in Indiana before coming to Tennessee. Hatfield stated that he would take the Defendant's word as truthful. He also stated that he knew the Defendant to have a reputation for truthfulness in the community.

In rebuttal, M.K. testified that she had a discussion with the Defendant about his impotence, and she recalled him visiting the doctor for the problem. She stated that the Defendant told her that he "could not do what he needed to do for [Mrs. Kimbrell],"and whenever he was in bed with his wife, "he would think about [M.K.] or something so that he could perform to [his wife]." M.K. maintained that the Defendant had "no trouble" getting erections when he was with her. On cross-examination, M.K. admitted that she never told anyone who interviewed her about the Defendant's impotence or about her conversations with the Defendant about it. She stated that she told only her lawyer that information.

Shane Lyttle testified that he worked for the DHS and that he had previously worked for the Department of Children's Services as a child abuse investigator. He stated that he was assigned to investigate the case involving the Defendant and M.K. He stated that he interviewed M.K., but he did not ask her any questions about impotence because he did not realize that impotence was an issue in this case. He explained that during an initial interview of a child who may have been abused, he does not focus on the details. According to Lyttle, the priority is to find out if the child is in immediate danger and needs to be removed from the home. Lyttle stated that the specifics are investigated later.

Lyttle testified that he interviewed the Defendant on November 10, 1997 about the allegations made by M.K. He stated that the Defendant denied the allegations of sexual abuse, but admitted to having an argument with M.K. on the day that Mrs. Kimbrell left. Lyttle recalled the Defendant telling him that he found M.K. on the phone with a boy, that he got on the phone, "cussed" the boy, and hung up. Lyttle also reported that he and the Defendant discussed the

"particular statement" referring to moving M.K. into the bedroom, that was made when Mrs. Kimbrell left.

On cross-examination, Lyttle testified that he taped his first interview with M.K., but he did not tape the later interview with the Defendant. He testified that the interview with the Defendant was dictated from his notes and transcribed, which is the normal procedure included in the child abuse protection handbook and manual. He testified that the Defendant claimed to have had problems with M.K. passing out condoms at school.

## B. Evidence Presented at the Sentencing Hearing

At the sentencing hearing, two juvenile males each testified that they had sexual relations with M.K. during the time she claimed to have had sex with no one but the Defendant. Will Campbell, who was nineteen years old at the time of trial, testified that in 1996 he had sexual intercourse with M.K. on one occasion in a barn at the Kimbrell home and that she had performed oral sex on him on another occasion. He stated that when they had intercourse, he found blood on his genitals that was not his own. Campbell had admitted that he initially denied having sexual relations of any kind with M.K. when interviewed by investigator Mitch Stephens from the District Attorney's office.

Campbell testified that M.K. told him she had sexual relations with three other boys, Travis Stowers, Nathan Elliott, and Jessie Brown. Jessie Lee Brown, who was eighteen years old at the time of trial, testified that he had intercourse once with M.K. when he was fifteen years old. Travis Stowers, who was eighteen years old at the time of trial, denied ever having sexual relations with M.K.

Danielle Kimbrell, M.K.'s twenty-one-year-old cousin, testified that her uncle, the Defendant, brought his adopted daughters to visit her family in Indiana approximately twice a year. According to Danielle Kimbrell, on one occasion in the summer of 1997, M.K. asked her for advice about sexual techniques because M.K. and her boyfriend had been having sex. When asked if M.K. could have been referring to the Defendant as her boyfriend, Kimbrell responded, "I don't know." She also testified that M.K. told her that she loved her parents, but she did not like the way she was being raised. On cross-examination, Danielle Kimbrell stated that before the trial in this case, she told Defendant's trial counsel the same information about which she was testifying in the sentencing hearing. She also stated that she did not know to whom M.K. was referring when she was talking about having sex with her boyfriend.

Frances Kimbrell, the Defendant's ex-wife, testified that she had been married to the Defendant for thirty-three and a half years. She stated that she filed for divorce just before the allegations in this case and that her reasons for the divorce were incompatibility and deterioration of the marriage over the years. She stated that she did not talk to the Defendant's trial counsel before the trial. Mrs. Kimbrell admitted that DHS had previously investigated her for hitting M.K.'s sister. She stated that she underwent, and successfully completed, counseling. Mrs. Kimbrell denied ever

making the children eat soap as punishment. She maintained that she had no knowledge of any sexual abuse of M.K. by her husband, nor did she believe that he had the character to commit such abuse. Mrs. Kimbrell recalled that both M.K. and Bethany had often been untruthful in the past. On cross-examination, she confirmed that her husband had impotence problems, which persisted even after he had two visits with a specialist. She stated that on the night she left, she wanted M.K. to go with her, but M.K. chose to stay. Kimbrell acknowledged that in November 1997, she told Shane Lyttle that Bethany had also made allegations regarding the Defendant. She admitted telling the Defendant on the night she left, "[Y]ou might as well move her in there now." Kimbrell stated that she was referring to M.K. because M.K. refused to leave. She maintained that she was referring to a "position of authority" rather than the Defendant's bedroom.

James R. Kimbrell, the Defendant's oldest child, testified to his father's good character. Danny Lee Kimbrell, the Defendant's brother, also testified to the Defendant's good moral character. He further testified that he believed M.K. was not a truthful person. Danny Kimbrell testified that another brother, Lonnie, had also adopted a daughter, Margo, who, a couple of years before this case, had made accusations of sexual abuse against Lonnie. He stated that the allegations never resulted in a criminal prosecution, but the daughter did leave the home and did not return.

Bethany Kimbrell testified that in the fall of 1997, the Defendant touched her inappropriately on her breasts on two separate occasions on the basement stairs. On cross-examination, Bethany admitted that she told Shane Lyttle that she was in her room when the Defendant touched her. She reported that when the allegations made by M.K. came out, Julie asked Bethany if anything like that had ever happened to her, and she replied that it had not. Bethany testified that when Mrs. Kimbrell left the home, she said something like "[W]ell, he can have her . . . ." She also testified that her mother made her eat soap as a punishment once or twice.

M.K. testified that she never had sexual relations with Will Campbell, Jessie Brown, Nathan Elliott or Travis Stowers. She admitted that she knew of the allegations made against the Defendant's brother, Lonnie Kimbrell, but she stated that she was very young when the allegations were made. M.K. denied ever having any conversations with her cousin, Danielle Kimbrell, about sex and stated that she had only seen Danielle a few times in her life. M.K. also denied ever talking to her cousin about Margo, the cousin who had made allegations of sexual abuse against her adoptive father, Lonnie Kimbrell. M.K. testified that the Defendant was "real mean" and that he punished her by making her eat soap and by kicking her. However, she admitted that she wrote letters to her father saying that he was her "hero." She also acknowledged that she sporadically kept a diary, but she never wrote anything in it about her father abusing her in any manner.

In rebuttal, Danielle Kimbrell testified that she and M.K. did have a conversation about their mutual cousin, Margo, and the allegations Margo had made against her adoptive father, Lonnie Kimbrell. Danielle further testified that during that conversation, M.K. asked if Margo "got any money out of it." She restated that, contrary to M.K.'s testimony, the two girls had seen each other at least twice a year until this case began. On cross-examination, she reported that the situation with Margo had occurred recently, about two to two and a half years prior to the sentencing hearing.

-11-

Finally, Danielle testified that she had spoken to her mother about the conversation with M.K. regarding Margo and she did discuss it with the Defendant's trial counsel before the trial. Danielle acknowledged that she spoke to defense counsel about the conversation she had with M.K. during which M.K. asked her about sexual techniques.

### C. Evidence Presented at the Hearing on the Motion for a New Trial

Jessie Lee Brown confirmed his testimony from the sentencing hearing that he did have sexual intercourse with M.K. Brown testified that he and M.K. talked on the phone and that he then hitchhiked and met her at a church. According to Brown, Andrea Gunter lived about 200 yards from the church. Brown stated that after meeting at the church, he and M.K. "drifted off" to some nearby oil tanks and had sex. He also testified that Gunter had knowledge of his having sexual intercourse with M.K., but he admitted that he did not mention Gunter at the sentencing hearing when describing these events. Brown testified that he did not talk to defense counsel before trial.

Andrea Gunter, who was eighteen years old, testified that the first time she had spoken with anyone about this case was after the trial in April 2000. She stated she was friends with Jessie Brown, and she recalled an occasion three years prior to the hearing when M.K. and Jessie Brown had come to her house. She stated that two other friends, Julie Watson and Ronnie Wall, were there at the time. Gunter recalled that she and M.K. walked to a nearby church prior to everyone's arrival at her house. Gunter testified that Jessie Brown, Julie Watson, and Ronnie Ball met them at the church. Gunter testified that she and M.K. then walked back to her house, while the other three drove. She testified that at some point, Brown and M.K. wandered off by themselves. Gunter reported that Brown and M.K. returned about ten minutes later. Gunter testified that "[M.K.] kissed Jessie, told him that she loved him and she ran inside [Gunter's] house." Gunter testified that she followed M.K. inside the house, and M.K. told her that "they had sex." Gunter stated that a few days or weeks later, Jessie Brown told her that he had sexual intercourse with M.K. She testified that she and Brown talked about the incident again some time later after this was pending. On cross-examination, Gunter testified that she did not see M.K. and Brown kiss in the church.

Jetta Fulmer, the Defendant's sister, testified that Danielle Kimbrell and M.K. were friendly and that she had been around the two girls when they saw each other on about eight separate occasions. She stated that she knew they had been together "quite a lot." Fulmer brought photographs of Danielle, M.K., and Bethany Kimbrell together at family events and stated that they "were very friendly with each other."

The Defendant's brother, Lonnie Kimbrell, testified that he and his wife had adopted his wife's half-sister's three children in 1986. He testified that the middle child, Margo, made allegations of sexual abuse against him in 1993. He testified that she alleged that he "had been sexually inappropriate with her since she was ten years of age." Kimbrell stated that Margo made the allegations after he had hit her three times with a belt for being caught in the school cafeteria with a boy whose hand was in her pants. He testified that the criminal investigation of this case spanned over a year, but the criminal investigation was dropped in 1995, and no charges were ever

brought against him. However, he acknowledged that the adoption and custody of the children was pending in court until 1997. He stated that the case received public attention on the radio, on television, and in the newspapers. However, he testified that he did not talk to the Defendant about his problems. Kimbrell testified that he never regained custody of his adopted daughter.

M.K. testified that she used to work at a church near Andrea Gunter's house. She also said there were some oil tanks nearby. M.K. stated that she considered Gunter to be her friend and an honest person. However, M.K. denied having sex with Jessie Brown near the oil tanks and also denied ever telling Gunter she had sex with Brown.

Mitchell Stephens, a former sheriff, testified that at the time of the hearing, he worked for the District Attorney's Office. He testified that he and a Tennessee Bureau of Investigation (TBI) agent interviewed Will Campbell and that Campbell had been given a polygraph. He testified that after the polygraph test, Campbell made a sworn statement. Stephens recalled that Campbell's statement after the polygraph was different from the statement he made before and during the polygraph: Campbell's former statement contained a claim that he had sexual intercourse with M.K., and in the latter statement, he claimed that he had only had oral sex with her. He stated that he and the TBI agent interviewed Jessie Brown on the same day they interviewed Campbell. Brown was also given a polygraph. Unlike Campbell, Brown gave no other sworn statement after his polygraph. Stephens also said he talked with Andrea Gunter's mother.

Shane Lyttle testified that in addition to interviewing M.K. and the Defendant, he had interviewed Frances Kimbrell, the Defendant's former wife. He reported that she told him that on the night she left the home she had shared with the Defendant, she told the Defendant that he "could just go ahead and move her into his bedroom now because she was practically there anyway." Lyttle stated that Mrs. Kimbrell told him that when she heard of the allegations made by M.K. against the Defendant, "it explained a lot to her." According to Lyttle, Mrs. Kimbrell stated that the Defendant "certainly had favored M.K. over her," and she told him that she and the Defendant "hadn't had sexual relations in the past two (2) years." He testified that Mrs. Kimbrell also told him that she would not move back into their home and that she had contacted a lawyer about getting a divorce.

Finally, Linda Reagan testified that Jessie Brown was put into foster care in her home in 1996. She testified that Brown told her that he had sexual intercourse with M.K. several times in M.K.'s bedroom. Reagan stated that she had contacted the Defendant about Brown's claims that he had sex with M.K.

### III. ANALYSIS

#### A. Ineffective Assistance of Counsel

The Defendant argues that he was denied effective assistance of counsel at trial. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453,

461 (Tenn. 1999). The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

The Defendant claims that counsel was ineffective for (1) failing to interview Will Campbell, who was subpoenaed to testify at trial, (2) failing to locate or interview Jessie Brown, (3) failing to present the testimony of Andrea Gunter, and (4) failing to present the testimony of Danielle Kimbrell.

Jimmy White, the Defendant's trial counsel, testified at the hearing on the motion for new trial that he is an attorney who has been licensed to practice in Tennessee for seventeen years and that he is a part-time general sessions judge in Clay County, Tennessee. He stated that he was retained by the Defendant within a week after the allegations were first made by M.K. He stated that he represented the Defendant on various legal matters, including the removal of M.K. and Bethany from the Kimbrell home and his divorce from Mrs. Kimbrell. He testified that the criminal charges in this case did not arise until May 1998. White testified that he met with the Defendant about fifteen to twenty times prior to trial.

White testified he interviewed M.K. prior to trial, and she told him that she never had sex with anyone other than the Defendant. He also stated, however, that there was some indication prior

-14-

to trial that M.K. had engaged in sexual relations with boys her own age before she made the accusations against the Defendant. He testified that according to his notes, "Some heard she had sex, she denied. Danielle says - admitted." White stated that Danielle Kimbrell had indicated that M.K. had prior sexual experience. White explained that pursuant to his understanding of Tennessee Rule of Evidence 412, the "Rape Shield Law," he was prevented from presenting such evidence on his own initiative. He also stated that he did not anticipate that the Assistant District Attorney would "open the door" to allow him to present the evidence. As such, he did not pursue that avenue of investigation. However, he noted that "clearly the door was opened . . . when [the State] asked her [if she] had sex with anyone."

White further testified that he made tactical decisions not to call Frances Kimbrell to testify, not to use a letter M.K. had written to her father, and not to use M.K.'s diary at trial. He stated that he did not call Danielle Kimbrell to testify about her conversations with M.K. because of his understanding of the law at the time and because he felt that the jury might perceive her testimony as biased toward her uncle. White testified that he decided not to use other family members as character witnesses due to similar concerns of perceived bias, although he did call the Kimbrells' biological daughter, Julie Kimbrell. He reported that he called Julie Kimbrell as a witness because she was able to describe the rules by which girls in the Kimbrell house lived and to state her opinion that she did not find the rules unreasonable or too restrictive, even though M.K. did rebel against them. Counsel testified that he believed that he had sufficiently attacked M.K.'s credibility.

Counsel testified that he subpoenaed Will Campbell and Campbell's mother, Myrtle Campbell, to testify, but he did not actually call them to testify at trial. According to counsel, Myrtle Campbell said that she thought M.K. was "trouble" and did not want her "hanging out" with her son. Counsel testified that it was a tactical decision not to call Campbell or his mother to testify.

White testified that prior to trial, he was not aware of the identities of anyone who since claimed to have had sex with M.K. while she was living in the Kimbrell house, nor did he know the identities of anyone other than Danielle who had any knowledge that M.K. was having sex with boys her own age. He stated that if he had known that there were people who could testify as to M.K's sexual history, he certainly would have used them at trial. White also stated that he did not know about the allegations M.K.'s cousin, Margo, made against her adoptive father, but would have used the information to provide motives for M.K.'s allegations had he been aware of the allegations.

White was unable to provide any reason why he made no attempt at trial to exclude or to object to testimony about unindicted charges against the Defendant. He also had no explanation as to why he failed to insist that the Assistant District Attorney make a formal election of the charges for which convictions were sought. He acknowledged that the jury came back and asked for the bill of particulars. He also acknowledged that the State referred to each indicted offense and explained that the indicted charges were the ones that M.K. remembered with specificity.

White testified that he did not introduce M.K.'s diary or letters because he was trying to show that M.K. was not happy in the Kimbrell's home and that her motive in accusing the Defendant was

to be able to leave that home. He stated that it was a tactical decision not to call Frances Kimbrell to testify because he was unsure what she would say regarding the night she left the home. He testified that he did not know about Lonnie Kimbrell and the charges that were brought against him.

Regarding Danielle Kimbrell, counsel explained that he did not call her to testify for tactical reasons. The trial court also noted that Danielle Kimbrell's testimony probably would not have affected the jury's verdict. The trial court stated that counsel was not ineffective for failing to call James Kimbrell or Danny Kimbrell to testify as character witnesses. According to the trial court, counsel explained why he did not call family members to testify.

The trial court found that counsel was not ineffective for failing to cross-examine M.K. about her diary. The court stated that it was a tactical decision by counsel that was "consistent with the defense theory at trial." The trial court noted that there was "no showing . . . from review of the diary or . . . any other evidence, that this would . . . have prejudiced [the Defendant] . . . or the case at all."

However, we conclude that counsel's strategy was deficient because it was founded on an inadequate understanding of Tennessee Rule of Evidence 412. We further conclude that inadequate preparation is responsible for trial counsel's lack of understanding of Rule 412. An abundance of legal authority pertaining to Rule 412 was available to counsel prior to trial. Counsel should have been very familiar with possible situations in this case that would "open the door" for the admissibility of such evidence. Although evidence of a victim's past sexual experiences or sexual reputation is generally not admissible, such evidence may be admissible to rebut or explain medical or scientific testimony. Tenn. R. Evid. 412(c)(4)(i).

Tennessee Rule of Evidence 412 provides that evidence of a sex offense victim's reputation and specific instances of sexual behavior are generally inadmissible, with certain exceptions. Tenn. R. Evid. 412(b). Evidence of specific instances of conduct relative to the victim's sexual behavior with persons other than the defendant is admissible if offered to rebut or explain medical or scientific testimony. Tenn. R. Evid. 412(c)(4)(i). The State may open the door for evidence concerning a victim's prior sexual behavior by presenting expert evidence of an injured hymen or other evidence indicating that a victim has been sexually penetrated. See generally Tague v. Richards, 3 F.3d 1133 (7th Cir.1993); United States v. Begay, 937 F.2d 515 (10th Cir.1991).

In order for Rule 412 evidence to be admissible, the defendant must first file and serve a written motion to offer such evidence no later than ten days before trial is scheduled to begin, with such motion containing a written offer of proof of the specific evidence and the defendant's purpose in introducing it. Tenn. R. Evid. 412(d)(1).[2] The court must then hold a hearing outside the hearing of the public and the jury to determine whether it will allow admission of the evidence by balancing

---

[2] However, the motion may be made at a later time if the court determines that the evidence is newly discovered and could not have been discovered earlier through due diligence or that the issue related to the evidence is newly arisen. Tenn. R. Evid. 412(d)(1)(i).

the probative value of the evidence with its unfair prejudice to the victim. Tenn. R. Evid. 412(d)(2), (4).

Trial counsel testified at the hearing on the motion for new trial that he could not foresee the prosecution "open[ing] the door" to allow testimony of M.K.'s sexual activities with others to be introduced. However, trial counsel was aware prior to trial of the medical evidence to be introduced by the State. Trial counsel also knew that M.K. maintained she had not had sexual intercourse with anyone but the Defendant; she told him so herself when he interviewed her prior to trial. Moreover, the door actually was opened. First, M.K. testified that she had never had sex with anyone but the Defendant. It was opened again when the medical evidence was introduced. It was opened, yet again, during cross-examination of the Defendant:

Q:     And I believe you told Mr. Lyttle here that you weren't aware of any
opportunity, where [M.K.] would have been able to have sex with any boys
unless she done it while she was at school, isn't that what you told him?
A:     Yes, pretty much so, I believe that is correct.
Q:     And that would be . . . still be true today, you are not aware of any
other times she would have had sex with anybody?
A:     I have found out a lot of things since she left.

Trial counsel failed to follow up on any of those occasions. We conclude that counsel's failure to recognize that this evidence would be presented, thus "opening the door," indicates that trial counsel's representation fell below the range of competence demanded of attorneys in criminal cases.

In State v. Brown, 29 S.W.3d 427 (Tenn. 2000), our supreme court reversed an aggravated rape conviction because the defendant was denied the opportunity to present to the jury critical evidence concerning statements that the minor female victim had sexual intercourse with an adolescent male during the time period in which the defendant was alleged to have raped the victim. See id. at 431, 436. In Brown, as in this case, the State's case against the defendant consisted of the testimony of the alleged victim together with the State's expert medical proof. The Brown decision includes the following language, which we believe applies directly to the instant case:

Excluding the proffered evidence essentially deprived Brown of an opportunity to
present to the jury critical evidence of an alternative explanation for the
complainant's hymenal injury. In the absence of this evidence, the jury no doubt
attributed the complainant's physical condition to Brown's alleged criminal conduct.
As previously noted, when the prosecution relies upon evidence of a complainant's
physical condition in a sexual assault/abuse case involving an underage rape
complainant, defense evidence that provides an alternative explanation for the
condition is particularly critical. Indeed, the only evidence which made this case
more than a pure credibility contest was the State's expert proof of physical injury
to the complainant. Significantly, the State's own medical expert conceded on cross-
examination that the physical injury he observed was consistent with the complainant
engaging in a consensual sexual encounter with an adolescent male. Under such

-17-

circumstances, depriving the defendant of the right to present critical, reliable hearsay evidence of an alternative explanation for the injury is constitutional error. We are unable to conclude that error was harmless beyond a reasonable doubt in this case. Id. 435.

It is important to note that in our view the Rule 412 evidence that counsel failed to present was not inadmissible under other evidentiary rules. Two witnesses testified in post-trial hearings that they had sex with the victim. One witness testified that the victim told her that she (the victim) had sex with Jessie Brown, which is a prior inconsistent statement by the victim. Another witness testified that the victim inquired about "sexual techniques" to be utilized by the victim with the victim's boyfriend, which is also arguably a prior inconsistent statement by the victim. Finally, the victim's knowledge of her cousin's accusations of sexual abuse against a foster parent and the resulting removal of the cousin from the home is certainly relevant as to the issue of the victim's motive for making the accusations against the Defendant.

We note that the trial court found that the testimony of Will Campbell and Jessie Brown was not credible, and we are mindful that questions concerning the credibility of witnesses and the weight and value to be given to their testimony are generally resolved by the trial court rather than this court. State v. Brown, 6 S.W.3d 453, 461 (Tenn. 1999). However, in light of the abundance of Rule 412 evidence that should have been presented to the jury for its consideration, we conclude that the deficiency in counsel's performance was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable. Strickland, 466 U.S. at 694. Although the trial court determined that counsel chose not to present some Rule 412 evidence for strategic reasons, we note that deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). As we have stated, trial counsel was not adequately informed or prepared with regard to the Rule 412 issues. Further, the issue of counsel's effectiveness is reviewed under a de novo standard with no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457 (Tenn. 2001).

We believe the prejudicial effect of trial counsel's deficient representation is demonstrated by the emphasis placed on the lack of evidence of any prior sexual activity of the victim. During closing argument, the prosecutor stated:

> Sue Ross, who is an expert in the area of doing physical examinations on abused children, to determine what injuries and how they were suffered, and how - she can explain that and how that relates to whether or not a crime has been committed.
>
> She told you that on the 7th day of January of 1998, after this was reported, that she examined [M.K.]. And she can say - [M.K.] has suffered a penetrating injury, trauma to the vagina. Which indicates that [M.K.] has had sexual intercourse. So, this - we know that [M.K.] has had sexual intercourse.
>
> Now, [M.K.] tells you that prior to January 7th, 1998, when [M.K.] was examined by Sue Ross, [M.K.] never had sex with anyone but that man right there,

James Kimbrell. That is the only man [M.K.] ever had sex with before [M.K.] was examined.

There has not been one iota of proof that [M.K.] had sex with anyone before that date, except James Kimbrell. And Mr. Kimbrell himself said - I don't know when [M.K.] would have had a chance to have seen a boy except at school. And we all know from his testimony and everybody's testimony - and almost in agreement here, that he kept all of these children under close ramp and guard. They didn't go anywhere except to church and school. And even we later know that [M.K.] was home schooled.

Only he had the opportunity. And the only proof that [M.K.] had had sex with anyone before January 7th, 1998, was [M.K.'s] testimony that it was Mr. Kimbrell and that was the only person.

Because there was a reasonable probability that the result of the trial would have been different had the jury heard the Rule 412 evidence, the Defendant was denied his constitutional right to effective assistance of counsel. The failure of trial counsel to render effective representation prejudiced the Defendant and prevented him from receiving a fair trial with a reliable result. Accordingly, we must reverse the convictions and remand for a new trial. However, we will address the remaining issues in this appeal.

## B. Newly-Discovered Evidence

The Defendant argues that the trial court erred by denying his motion for a new trial based on newly discovered evidence. Specifically, the Defendant argues that information that M.K. had sexual relations with boys other than the Defendant constitutes newly discovered evidence that entitles him to a new trial. In addition, the Defendant argues that he should be allowed to introduce evidence that M.K. was interested in the outcome of a case involving similar allegations against the Defendant's brother.

A new trial on the basis of newly-discovered evidence should be granted in cases where (1) the defendant has been reasonably diligent in obtaining evidence, (2) the materiality of the new evidence is apparent, and (3) the evidence is likely to change the result of the trial. State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993). In order to be entitled to a new trial based on newly-discovered evidence, a defendant must demonstrate that all three prongs of the test have been met. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994).

We conclude that the Defendant failed to show that he was reasonably diligent in obtaining this evidence. Trial counsel knew before trial that the Defendant and other members of his family had reason to believe that M.K. had engaged in sexual relations with other juvenile males. The record shows that the allegations against the Defendant were made in November 1997, the indictment was handed down in May 1998, and the trial was held in September 1999, allowing the Defendant ample time to explore alternate theories. Two of the new witnesses were found within two months of the trial, in time for the sentencing hearing in November 1999. Because the

Defendant has not met the first prong of the test pertaining to his request for a new trial based on newly-discovered evidence, this issue is without merit.

## C. Evidence of Uncharged Sexual Offenses

The Defendant argues that the trial court erred by allowing the State to introduce testimony concerning uncharged offenses alleged to have occurred during the same period of time as the fifteen specific incidents charged in the indictment. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. Tenn. R. Evid. 404(b). It may, however, be admissible for other purposes. Id.

In State v. Rickman, 876 S.W.2d 824, 829 (Tenn. 1994) the Tennessee Supreme Court held that there is no general "sex crime" exception to the general rule against admitting evidence of other crimes. see also State v. Burchfield, 664 S.W.2d 284, 287 (Tenn. 1984). However, the Rickman court did recognize that, as a limited exception, the State should be allowed some latitude in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed. Rickman, 876 S.W.2d at 828.

The State argues that the Defendant waived his right to appeal this issue by failing to object to the testimony at trial. We agree. By not objecting at trial, the Defendant "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). "When a party does not object to the admissibility of evidence, . . . the evidence becomes admissible notwithstanding any other [r]ule of [e]vidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'" State v. Smith, 24 S.W.3d 274, 280 (Tenn. 2000) (quoting State v. Harrington, 627 S.W.2d 345, 348 (Tenn. 1981). In the absence of a contemporaneous objection to proffered evidence in a criminal prosecution, the evidence is competent, and any complaint about the admission of such evidence is waived. State v. Hooper, 695 S.W.2d 530, 536 (Tenn. Crim. App. 1985).

Further, with regard to brief testimony of the victim pertaining to incidents allegedly occurring in Putnam County prior to the first incidents alleged in the indictment, the trial court stated that it "gave an exhaustive instruction to the jury that they were not to consider any action that occurred outside of Fentress County in this case." There is a presumption that the jury complied with the court's instruction. Frazier v. State, 566 S.W.2d 545, 551 (Tenn. Crim. App. 1977); Bennett v. State, 530 S.W.2d 788, 793 (Tenn. Crim. App. 1975); Craig v. State, 524 S.W.2d 504, 508 (Tenn. Crim. App.1974). We cannot conclude that the testimony "more probably than not affected the judgment" in this case. Tenn. R. App. P. 36(b); see also Tenn. R. Crim. P. 52(a). Therefore, we find this issue without merit.

## D. Severance

The Defendant argues that the trial court erred by not severing the offenses in this case. A trial court's denial of a motion for severance will be reversed only when there has been an abuse of

discretion. <u>State v. Shirley</u>, 6 S.W.3d 243, 247 (Tenn. 1999). This Court will not interfere with the exercise of this discretion unless it appears on the face of the record that the accused was prejudiced by the trial court's ruling. <u>State v. Wiseman</u>, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982). Whether severance should be granted "depends upon the facts and circumstances involved in the various crimes that are charged." <u>State v. Morris</u>, 788 S.W.2d 820, 822 (Tenn. Crim. App. 1990).

Rule 14 of the Tennessee Rules of Criminal Procedure provides as follows: "If two or more offenses have been joined or consolidated for trial . . . , the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim. P. 14(b)(1). To avoid severance, both portions of the rule must be satisfied. <u>See</u> <u>State v. Hallock</u>, 875 S.W.2d 285, 289 (Tenn. Crim. App. 1993).

The first prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure requires that the trial court find a common scheme or plan. In Tennessee, there are three categories of common scheme or plan evidence: (1) evidence showing a distinctive design or signature crime; (2) evidence demonstrating a larger, continuing plan or conspiracy; and (3) evidence that the offenses are part of the same transaction. <u>State v. Moore</u>, 6 S.W.3d 235, 240 (Tenn. 1999). "Before multiple offenses may be said to reveal a distinctive design, . . . the 'modus operandi employed must be so unique and distinctive as to be like a signature.'" <u>Id.</u> (citing <u>State v. Carter</u>, 714 S.W.2d 241, 245 (Tenn. 1986)).

> However, the Tennessee Supreme Court has noted that
> "the mere existence of a common scheme or plan is not a proper justification for admitting evidence of other crimes. Rather, admission of evidence of other crimes which tends to show a common scheme or plan is proper to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue. Unless expressly tied to a relevant issue, evidence of a common scheme or plan can only serve to encourage the jury to conclude that since the defendant committed the other crime, he also committed the crime charged."

<u>Id.</u> at 239 n.5 (quoting <u>State v. Hallock</u>, 875 S.W.2d 285, 292 (Tenn. Crim. App. 1993)). This court has also stated that "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." <u>Id.</u> at 240 n.7. Thus, Tennessee Rule of Evidence 404(b) is also relevant to our analysis of this issue. <u>See</u> <u>State v. McCary</u>, 922 S.W.2d 511, 513-14 (Tenn. 1996).

The second prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure requires that the evidence of each of the offenses be admissible at the trial of the other. Evidence that the accused committed crimes independent of those for which he is on trial is generally inadmissible because such evidence lacks relevance and invites the finder of fact to infer guilt from propensity. <u>See</u> <u>Moore</u>, 6 S.W.3d at 239; <u>see also</u> Tenn. R. Evid. 404(b). However, evidence of other crimes, wrongs, or acts may be admissible for other purposes. <u>Id.</u> The "primary inquiry" in any severance case is whether the evidence of one offense would be admissible in the trial of the other if the two offenses remained severed. <u>State v. Burchfield</u>, 664 S.W.2d 284, 286 (Tenn. 1984).

In this case, the Defendant was indicted on thirty-two different charges. The Defendant filed a motion to sever the charges of reckless endangerment and reckless driving from the sexual offenses, which was granted. However, counsel did not move to sever the remaining sexual offenses from each other. At the beginning of trial, the court noted that the parties agreed that there were actually twenty-five complete charges against the Defendant, including five counts of rape of a child, five counts of rape, and fifteen counts of incest. The trial court later dismissed three charges. All of the twenty-two remaining charges relate to thirteen specific incidents occurring between 1990 and 1997. Thus, the Defendant was tried on and convicted of four counts of rape of a child, five counts of rape, and thirteen counts of incest. The factual basis for these convictions involved fourteen specific incidents between 1990 and 1997.

We conclude that the trial court did not err by not severing the charges against the Defendant. We note that the Defendant did not file a motion for severance of the sexual offenses, while specifically moving for a severance of the two non-sexual offenses. Thus, the Defendant has waived this issue. See Tenn. R. Crim. P. 14(a); Spicer v. State, 12 S.W.3d 438, 443 (Tenn. 2000).

### E. Doctrine of Election

The Defendant argues that there was no proper "election" by the State and that this error was compounded by the failure of the trial court to properly instruct the jury on how they were to consider the evidence of the unindicted offenses. The doctrine of election requires the State to elect a set of facts when it has charged a defendant with one offense, but there is evidence of multiple offenses. State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999). Where evidence of unindicted offenses is introduced at trial, it is "the duty of the trial judge to require the State, at the close of its proof-in-chief, to elect the particular offense . . . upon which it would rely for conviction, and to properly instruct the jury so that the verdict of every juror would be united on the one offense." Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973).

The Tennessee Supreme Court has held that election is required for three fundamental reasons: "[f]irst, to enable the defendant to prepare for and make his defense to the specific charge; second, to protect him from double jeopardy by individualization of the issue . . . [;] and third, so that the jury's verdict may not be a matter of choice between offenses, some jurors convicting on one offense and others, another." Id. at 803.

"The necessity of requiring the State to make an election of the particular offense it will rely on for conviction . . . is . . . fundamental, immediately touching the constitutional rights of an accused, and should not depend upon his demand therefor." Id. at 804. Although the federal constitution's requirement of unanimity among jurors has not been imposed on the states through the Fourteenth Amendment, "there should be no question that the unanimity of twelve jurors is required in criminal cases under our state constitution." State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). A defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of

creating a "patchwork verdict" based on different offenses in evidence. See id. (citing United States v. Duncan, 850 F.2d 1104, 1110 (6th Cir. 1988)).

The State argues that the record clearly demonstrates that the closing argument focused the jury's attention on the exact acts upon which the State asked the jury to deliberate in determining the Defendant's guilt. The State maintains that this constituted a de facto election. The State relies on State v. William Dearry, No. 03C01-9612-CC-00462, 1998 Tenn. Crim. App. LEXIS 165 (Tenn. Crim. App., Knoxville, Feb. 6, 1998) to support the proposition that the State can, in effect, elect the proof upon which it sought conviction, even though the trial court did not explicitly require an election. Id. at * 32.

We agree, and even the Defendant concedes, that the prosecutor did an admirable job of trying to "sort this out" during his closing argument to the jury. In our view, the prosecutor during argument did in fact effectively elect the proof upon which the State wished to proceed in each count of the indictment. The Defendant properly asserts that the prosecutor's argument is neither evidence nor a substitute for a proper jury instruction. Both an election by the State and a jury instruction are required to safeguard the accused's constitutional rights. See Burlison 501 S.W.2d at 803. Our review of the record shows that the trial judge failed to require the State to make an election and failed to give the jury any instruction in how it was to consider the proof presented of the unindicted offenses. However, we conclude that any error pertaining to this issue was harmless beyond a reasonable doubt under the circumstances of this case. We are convinced that the Defendant received a unanimous verdict in each count. This issue is without merit.

F. Closing Argument by the State

Finally, the Defendant argues that the District Attorney improperly argued to the jury that the defense attorney "needs to explain the situation that we read about all the time in the papers where women have - who are in their thirties, their forties, finally come forward and talk about how they were sexually abused for years . . . ." Immediately after this statement, the defense objected and argued that the statement was "outside the facts of this case." The trial court then stated,

Ladies and gentlemen, this is closing argument. Now, what we have here is not evidence. We have the lawyer's interpretations and their explanations of their respective theories in this case. What the lawyers say at this point is not evidence. It is merely there to help you. You can factor in the evidence that you heard yesterday and that is what you are to consider this case on. But they are here to explain what . . . their side is. I am going to overrule the objection, but you can respond.

Lawyers are prohibited from arguing facts which are outside the record. State v. Beasley, 536 S.W.2d 328, 330 (Tenn. 1976). Where argument is improper, the established test for determining whether there is reversible error is "whether the improper conduct could have affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). In determining whether the improper argument

prejudiced the defendant, the appellate court must consider: "1) the conduct complained of, viewed in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecution; 3) the intent of the prosecutor in making the improper argument []; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength and weakness of the case." State v. Middlebrooks, 995 S.W.2d 550, 560 (Tenn.1999); State v. Bowers, 77 S.W.3d 776, 788 (Tenn. Crim. App. 2001).

In this case, defense counsel objected immediately after the State made the remarks. The trial court immediately gave a curative instruction, and a similar instruction was included in the jury charge. We agree with the State that the Defendant has failed to show that the State's argument was grossly improper or that the Defendant was prejudiced by it in light of the instruction by the trial court. While the State's comments may not have been properly worded, we find any error regarding the State's contested statement during closing arguments to be harmless. Defense counsel made a point during examination of M.K. of eliciting testimony that she had not reported any sexual abuse to anyone over the years, even though she had many opportunities to do so and even though she made other complaints to the authorities about her adoptive mother.

For the reasons set forth in the discussion above, we conclude that the Defendant was denied effective assistance of counsel. We, therefore, REVERSE the Defendant's convictions and REMAND this case to the Fentress County Criminal Court for further proceedings consistent with this opinion.

_____
ROBERT W. WEDEMEYER, JUDGE